Filed 5/13/25  P. v. Rivers CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C099737 |
| Plaintiff and Respondent, | (Super. Ct. No. 22FE011080) |
| v. | |
| DEVON RIVERS, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

While they were alone in S. Doe's bedroom, defendant Devon Rivers performed oral sex on Doe, and they had sexual intercourse. According to Doe, none of the sexual activity was consensual. According to defendant, everything was consensual until Doe said, "stop" 20 to 30 seconds before he ceased having sexual intercourse with her. Defendant said he did not think Doe was serious the first time she said "stop," but he

1

stopped when he saw Doe was crying and she said "stop" a second time. A jury found defendant guilty of forcible rape and not guilty of forcible oral copulation. On appeal, defendant contends that, given its verdicts, the jury must have believed his version of the events. He argues the guilty verdict must be reversed because (1) given his recitation of events the evidence was insufficient to support a finding of guilt; (2) the trial court impermissibly added language to the pattern instruction for rape that was legally incorrect, argumentative, and lowered the standard of proof; and (3) the trial court erred because it did not instruct the jury on the lesser included offense of simple battery. We disagree and affirm the judgment.

Defendant also argues the abstract of judgment issued in this case must be corrected to reflect the trial court imposed lower fees in its oral pronouncement of judgment than the fees listed on the abstract. We agree and will order a corrected abstract of judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Facts

### Defendant and Doe Connect Online and Arrange to Meet

In the summer of 2021, Doe was 19 years old and living with her mother, grandparents, and a toddler baby sister. She was 5 feet, 4 inches tall, and she weighed approximately 130 pounds. Defendant was 18 years old and played football at community college. He was 6 feet, 1 inch tall, and he weighed 240 pounds.

Defendant, whom Doe knew as DJ, saw Doe's profile on Instagram and replied to one of her stories with an emoji with heart eyes. She responded with "TY," which means "thank you," and a little heart.

Doe and defendant exchanged phone numbers and over the following weeks communicated through phone calls, texts, and video calls. Doe found defendant

2

attractive. According to defendant, he asked Doe to be his girlfriend, but she said she was "talking"—considering a possible relationship—with someone else.

Once or twice as defendant and Doe got to know each other better she blocked defendant's phone number so that her phone would not receive his calls or text messages. She did so because she was concerned that he was talking with other girls. Once she called him and another girl answered, and he said it was his cousin or cousin's girlfriend and she "blocked" him after that. She felt like she was being played. According to defendant, Doe blocked him another time for a week to a month when she thought he was hanging up on her to talk to other girls.

Later Doe unblocked defendant and they resumed talking.

Doe and defendant discussed meeting in person. According to Doe, she would tell defendant he needed to meet her older brother or a guy friend first, because she had some hesitancy about meeting with someone she met online. Doe said defendant would shrug this off and keep pressing the issue.

Doe and defendant eventually agreed to meet in person, and they talked about going to a park. However, when they met—either at or near her house—defendant said he was tired. Doe told defendant he could come into her house and rest.

After defendant came into the house, he greeted Doe's grandparents and baby sister after which defendant and Doe went to her room. While they were in her room, her grandfather was in the living room watching TV; her grandmother was in her bedroom, which is across from Doe's bedroom, with the baby; and her mother was in her office/bedroom at the opposite side of the house.

#### Events After Defendant Entered the House

Doe and defendant provided different versions of the events that followed.

3

Doe's Testimony

According to Doe, defendant went with her into her room, closed and locked the door, and lay down on her bed.  She sat on or stood by the corner of the bed.  Defendant wanted Doe to move closer, but she made it clear she was staying where she was.

Defendant asked to see Doe's bracelet, and when she showed it to him he grabbed her wrist and pulled her closer to him.  She wound up on her side next to him on the bed with a little space between them.  He wanted to watch TV and cuddle.  She put a show he wanted to watch on the TV, and he got closer.

Defendant asked to kiss Doe, and she said, "no."  He kissed her on the mouth. Defendant got "handsy," touching her breasts over clothing, touching her vagina area over her clothing, then touching her vagina under clothing.  Doe told defendant to stop and watch the show.  More than once, Doe removed defendant's hands from her body, but he put them back.  Defendant told Doe to just watch the TV and let him do what he was going to do.

Doe was on her back and defendant was on top of her, and he removed her clothes. She told him no.

After removing Doe's shirt, defendant began to suck, lick, and bite her breast, which caused her pain.

When defendant tried to pull Doe's pants off, Doe tried to yank them back up.  The button on Doe's pants broke, and he removed her pants.

After defendant removed Doe's clothing, he put his mouth on her exposed vagina. Doe tried to push him off or squeeze her legs closed, but he overcame her.  He pushed her legs apart.  After performing oral sex on Doe, defendant asked her to reciprocate.  She said no.

Defendant took his pants off and put his penis in Doe's vagina.  She pushed against his chest, because she did not want to have sex.  Doe had told defendant she did

4

not want to have sex. By the time he penetrated her, Doe had communicated to defendant over five times that she did not want to engage in sexual activity.

The sex was painful.

Defendant was on top of Doe, chest to chest. Doe would try to push him away by pushing against his chest with her arms and legs. One time it worked, but he reentered her. Doe's attempts to move away were unsuccessful because defendant put his hands on her neck in something "like a choke" to hold her in place, though she never got to the point where she could not breath or blacked out.

Doe closed her eyes and waited for it to be over. She did not cry out for help because her mom is small, and her grandparents are old, and she was afraid with his size defendant would overpower them.

When Doe started crying, defendant stopped. He asked her what was wrong. She did not respond but kept crying. He asked her to tell him she loved him, and he asked what was wrong, but she would not really respond. She asked him to leave. He said he wanted to finish the episode of the show and she let him. They both got redressed. She believes she put on the same clothes. For the last 10 minutes or so of the show, she zoned out, not watching it.

When the show was over, Doe again asked defendant to leave. He asked if she was serious, and she said, "yes." He asked her to walk him to the door, and she did. When he left, she slammed and locked the door.

### Defendant's Testimony

According to defendant, when he and Doe entered her room, she told him to get comfortable, and he asked for a Q-Tip. Doe left to get a Q-Tip, and when she came back she closed and locked the door. Defendant and Doe sat on the bed talking. He put a show on the TV.

While on the bed, defendant and Doe talked about a girl he had been with a week or two before, when Doe had him blocked.  He wanted Doe to know Doe was the only girl he was talking to right then.

Doe wanted to cuddle, so they cuddled and watched the show.  Defendant did not pull Doe on the bed.  They moved closer to each other on the bed, and at some point "naturally" started kissing.

While Doe and defendant were kissing and touching, she asked him to stop and expressed some hesitation about touching and kissing for a few minutes due to the other girl they had talked about.  Other than while they were having sex, this is the only time Doe expressed hesitation and asked him to stop.

Defendant and Doe started touching each other in a more sexual way.  They began touching each other's "private parts."  Doe did not push defendant away.  She touched his penis.  She unbuckled the first buckle of her pants, and he put his hand in her pants.  The button did not pop off her pants.

Defendant helped Doe remove her pants.

Defendant asked Doe if she wanted to receive oral sex, and she nodded her head yes; so he gave her oral sex for four to five minutes.

Defendant asked Doe if she wanted to have sex and she said yes.  He began to push his penis in, but with just the tip in he stopped to ask if it hurt.  She said it hurt a little; so he slowed down.  He would characterize the sex as on the gentle side.

After defendant and Doe had been having sex for about eight to ten minutes, defendant heard Doe "say like a slight stop."  He "didn't really think anything of it."  He didn't think she was serious.  He testified it wasn't clear to him exactly what she wanted.

After 20 to 30 seconds, Doe said "stop" again, but louder.  He noticed she was serious that time.  He saw she had a tear coming out of her eye and immediately "got off her" and asked her what was wrong.  He thought Doe's crying was due to something "more mental" and that she was "going through something more personal."

6

Defendant sat and waited for Doe to cool down, so that she might be better composed to answer his questions.  He tried to comfort her.  But the first thing she said was that he should go.  He said okay and gathered his things, and when he was about to leave he asked if she needed a hug.  Doe hugged him, and he asked her to walk him out.  She walked him out.

### After Defendant Left

Doe's grandmother testified that she heard defendant ask Doe to walk him to the door, and Doe responded, "get out of here."  She saw Doe walk defendant to the door and Doe crying.  Doe slammed and locked the front door.  When Doe's grandmother asked what was wrong, Doe cried, shook her head, and ran towards her mother's room.

Doe told her mother she had been raped.  Her mother described Doe as frantic, unable to catch her breath and get words out, and visibly upset.  Doe's mother told Doe to wait a second while she shut down her workstation and alerted colleagues that she needed to take off.

Doe felt her mother was not moving fast enough and called her teenaged sister and asked her sister to come get her.  Doe was crying when she called her sister.

Doe's sister came and got her immediately.  When Doe's sister saw her, Doe was distraught and crying a lot, and Doe told her sister she had been raped by a guy who had come to the house.

Doe's sister took her to a family member's house where the sister was staying about a block away.  Doe's sister lent Doe some clothes to change into, and Doe put the clothes she had on in a bag.

Defendant tried to call, and Doe or her sister hung up on him.  According to defendant, he wanted to figure out what was wrong.

Doe's sister then called defendant to try to get more information.  According to the sister, she told defendant that he knew what he did to Doe, and he agreed.  Defendant

said, "I'm sorry." During his testimony, defendant acknowledged that he had apologized, but he claimed he was sorry Doe was crying. He said, "I was saying sorry for our first time meeting that she was upset. She was crying. I don't know if I did anything wrong or if it was something more personal, so I'm trying my best way to comfort her. So if me saying sorry in any kind of sort is showing sympathy to her that maybe something could be fixed about her attitude or the way she was acting." Defendant gave the sister a fake last name, because he felt she was being rude and aggressive.

Doe's mother went to where her daughters were and arranged for a ride that took all of them to the hospital.

During the sexual assault exam, Doe reported pain and some vaginal bleeding, but that it was possible the bleeding was related to her menstruation. She reported pain in a nipple and that she had been bitten on the nipple. She reported feeling fearful because the person who assaulted her was much bigger than she is. She said the suspect had locked her bedroom door.

The doctor noted lacerations, an abrasion, and bruising on part of Doe's genitalia. There was also tenderness on one of Doe's nipples, which was consistent with the report of being bitten. The doctor testified the exam findings were consistent with sexual assault and the genital injuries were consistent with recent sexual contact. The injuries the doctor observed were also relatively common after consensual sex.

At the hospital, Doe gave an officer the clothes she said she was wearing during the incident. The pants the officer collected were missing the top button. At trial, defendant claimed the pants presented as the ones the officer collected were not the same pants Doe wore during the incident.

An officer went to Doe's home and examined her bedroom. It appeared someone had recently slept in the bed, but the officer did not observe any signs of struggle in the room.

### The Pretext Call

At the hospital, in the presence of the police officer, Doe called defendant. The video of the conversation was played for the jury. During the call Doe asked, "DJ, why didn't you stop when I asked you to?" He responded, "[u]m, honestly because I didn't think that you were being serious." She said, "[w]ell, I said it a lot." He said, "I'm sorry." Later, after a discussion about him not wearing a condom, she said, "I didn't want to do it." He responded, "I'm sorry. But . . . when I noticed you was serious, I stopped."

### Defendant's Interview with a Detective

In October 2021, a detective interviewed defendant. During the interview defendant said he and Doe never specifically said, "let's have sex," but things were physically escalating and "it wasn't a no." She touched his penis.

Defendant said, "[a]nd then during the middle of sex, she's—she's just, you know starting to say 'no' and stuff like that." He said when he noticed her crying he "got off of her." When the detective asked why defendant didn't stop the first time Doe said "no," defendant said he "wasn't really sure because [she was] still telling me like, you know, okay, [with] all [her] moaning and stuff like that. So, I didn't know." Later he said, "[t]he first time she was saying no but still moaning. Like you know, like she was liking it, but didn't really mean it, so I didn't, you know, body language—she was, still wanting to have sex with me."

After defendant told the detective he had tried to comfort Doe once he knew she was crying, the detective asked what he was sorry for. Defendant responded, "[b]ecause she told me no, like you know." He said he didn't feel bad until he realized she was serious and crying. Later defendant admitted he knew Doe was crying "because of the sex" when he stopped. He said his apologies were, "from making her cry."

9

<u>Procedural</u> <u>History</u>

Count one of operative information charged the defendant with forcible felony rape under Penal Code section 261, subdivision (a)(2). Count two charged him with felony oral copulation accomplished against the victim's will by force, violence, duress, menace, and fear of immediate and unlawful bodily injury to the victim.

The jury found defendant guilty of forcible rape and not guilty of forcible oral copulation.

The trial court sentenced defendant to the low term of three years in prison.

Defendant filed a timely appeal.

DISCUSSION

I

*Elements of Rape*

Under Penal Code section 261, subdivision (a)(2), forcible rape is an act of sexual intercourse, "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

"Rape is a general intent offense." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022 (*Griffin*).) The general criminal intent must be a "wrongful intent." (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1140.) "The necessary 'wrongful intent' is not the intention to violate the law but the intent to commit the forbidden act. [Citation.] Where the charge is rape, the forbidden act consists of two elements: (1) sexual penetration, and (2) overcoming the will of the victim by force or fear. Thus, the 'wrongful intent' is the intent to sexually penetrate the victim and the intent to accomplish that act by force or fear." (*Ibid.*)

To find a person guilty of rape, a trier of fact must find that the defendant, (1) had sexual intercourse with the victim; (2) without the victim's consent; and (3) that the act of intercourse was accomplished by means of force, violence, duress, menace, or fear of

10

immediate and unlawful bodily injury on the person or another.  (*People v. Burnham, supra,* 176 Cal.App.3d at p. 1140; see also CALCRIM No. 1000.)

With respect to the second element, even if a sexual partner initially consents to sexual intercourse, "it is immaterial at what point the victim withdraws her consent, so long as that withdrawal is communicated to the male and he thereafter ignores it."  (*In re John Z.* (2003) 29 Cal.4th 756, 762  (*John Z.*).)  Consequently, "a withdrawal of consent effectively nullifies any earlier consent and subjects the male to forcible rape charges if he persists in what has become nonconsensual intercourse."  (*Id.* at p. 758.)  Thus, "a woman [can] withdraw her consent to sexual intercourse at any time, even during copulation, as long as that withdrawal was clearly communicated."  (*People v. Ireland* (2010) 188 Cal.App.4th 328, 339.)

With respect to the third element, the term "force" as used in Penal Code section 261, subdivision (a)(1), has not been specifically defined, and does not have any purely legal definition.  (See *Griffin*, *supra*, 33 Cal.4th at p. 1023.)  In *Griffin*, our Supreme Court explained, there is nothing "in the common usage definitions of the term 'force,' or in the express statutory language of section 261 itself, that suggests force in a forcible rape prosecution actually means force '*substantially* different from or *substantially* greater than' the physical force normally inherent in an act of consensual sexual intercourse.  ([*People v. ]Cicero*[ (1984)] 157 Cal.App.3d [465,] 474, italics added.)  To the contrary, it has long been recognized that 'in order to establish force within the meaning of section 261, [former] subdivision (2), the prosecution need only show the defendant used physical force of  a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].'  (*People v. Young* (1987) 190 Cal.App.3d 248, 257-258.)  Even prior to the pivotal 1980 amendment of the rape statute, when the victim's resistance to the rapist's attack and the rapist's act of overcoming that resistance by force or violence still had to be shown . . . , it was nevertheless understood that ' " '*The kind of physical force is immaterial*; . . . it may

11

consist in the taking of indecent liberties with a woman, or laying hold of and kissing her against her will.' " ' (*People v. Tollack* (1951) 105 Cal.App.2d 169, 171, quoting *People v. Bradbury* (1907) 151 Cal. 675, 677, italics added.)" (*Griffin*, at pp. 1023-1024.) "[T]he rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction." (*Id.* at p. 1027.)

The "*Mayberry* defense"—that the defendant actually and reasonably but mistakenly believed that the victim consented—is an affirmative defense to a charge of forcible rape. (*People v. Lujano* (2017) 15 Cal.App.5th 187, 194; see also *People v. Mayberry* (1975) 15 Cal.3d 143, 155 (*Mayberry*).) "[W]hen the record contains sufficient evidence of a defendant's reasonable belief in the complainant's consent to a sexual act, the jury must be instructed to find the defendant not guilty unless the prosecution proves beyond a reasonable doubt that the defendant did not actually *and* reasonably believe the complainant consented. (*Mayberry*, *supra*, 15 Cal.3d at p. 157.)" (*People v. Dillon* (2009) 174 Cal.App.4th 1367, 1381, italics added.) "This defense has both a subjective *and* objective component." (*People v. Sojka* (2011) 196 Cal.App.4th 733, 736, italics added.) To satisfy the subjective component, "the defendant 'must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent.' " (*Ibid.*, quoting *People v. Williams* (1992) 4 Cal.4th 354, 361.) Under the objective component, the defendant's belief regarding consent must be "*formed in circumstances society will tolerate as reasonable.*" (*Sojka*, at p. 737, italics added.)

II

*Substantial Evidence Supports the Verdict*

While not discussing the fundamentals of a review for sufficiency of the evidence and relying heavily on a dissenting opinion, defendant argues substantial evidence does not support the verdict finding him guilty of forcible rape.

Our role in reviewing a challenge to the sufficiency of evidence is limited. (*People v. Smith* (2005) 37 Cal.4th 733, 738.) We examine the entire record to assess "whether *any* rational trier of fact" could have found defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Thus, "we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid.*; see also *People v. Lucero* (2019) 41 Cal.App.5th 370, 414.) "That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial." (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

Substantial evidence is "evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *People v. Marshall* (1997) 15 Cal.4th 1, 35.) The testimony of one witness can be sufficient to support a conviction, "unless the testimony is physically impossible or inherently

13

improbable." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see also *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1347.)

The evidence supports the jury's verdict.

Doe testified she said "no" to defendant numerous times during their encounter as defendant continued to escalate the sexual nature of his touching. She removed his hands from her when he touched her, told him to watch TV, tried to prevent him from removing her pants, told defendant she did not want to have sex, and tried to push defendant off of her. Under these facts, her refusal to consent was apparent.

According to Doe, despite her protestations, defendant "yanking" her pants down causing a button to pop off, got on top of her, inserted his penis into her vagina, held her neck with his hand, and reinserted his penis into her vagina after she had managed to push him away. During her sexual assault exam, Doe reported feeling fearful of defendant, because defendant was much bigger than she was. When confronted by Doe and her sister about his actions, defendant apologized. The evidence supports the jury's determination that defendant used force to overcome Doe's unwillingness to have sexual intercourse.

Defendant does not argue that Doe's representations regarding what happened during the act of sexual intercourse do not support a rape verdict. Instead, defendant makes unpersuasive arguments that this court should ignore the evidence against him.

Defendant suggests that because the jury found him not guilty of forcible oral copulation but guilty of rape, it must have accepted his testimony regarding what happened in Doe's bedroom and rejected Doe's testimony.

"The jury is the ultimate judge of credibility. The jury may find a witness is credible in some respects and not in others; it may believe parts of a witness's testimony without believing all of it." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1029; see also *People v. Williams, supra,* 4 Cal.4th at p. 364 ["a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others"].) Indeed, like most juries, this

14

jury was instructed with CALCRIM No. 226, which told the jurors, "[y]ou may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." We assume this jury understood and followed this instruction. (See *People v. Chavez* (2000) 84 Cal.App.4th 25, 30-31.) Thus, the jury was able to—and instructed that it could—deem parts of Doe's testimony credible even if it did not find all of it credible.

In truth, we do not know what the jury's reasoning was when it reached the verdicts in this case. Defendant's argument is that the two verdicts are necessarily inconsistent and, therefore, we must reject the verdict of rape.

"Generally, a jury's inconsistent verdicts are permitted if the guilty verdict . . . is supported by substantial evidence." (*People v. Ervin* (2021) 72 Cal.App.5th 90, 110.) This is so, because the jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding through mistake, compromise, or lenity. (*People v. Santamaria* (1994) 8 Cal.4th 903, 911.)

"Our role is to determine the legal sufficiency of the found facts and not to second guess the reasoning or wisdom of the fact finder." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946.)

Defendant argues that, under his version of events, a finding that he used force to overcome Doe's will is unsupported. Defendant reasons that, based on defendant's testimony and the jury's verdict, this case involves a fact pattern of post-penetration withdrawal of consent. Defendant argues the evidence does not support a finding that his continuing penetration of Doe for 20 to 30 seconds after he admits she told him to "stop" was forcible rape.

As a preliminary matter, we note the only legal authority defendant cites to support this portion of his argument is the dissenting opinion of Justice Brown in the case of *John Z.*, *supra*, 29 Cal.4th 756. A dissenting opinion is not controlling authority. (*City of*

15

*San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 681, fn. 5.)

Defendant's efforts to convert the dissenting opinion in *John Z.* into persuasive authority are unconvincing. Defendant states that Justice Brown questioned whether a few minutes of delay in withdrawal of consent cases would be sufficient to prove forcible rape. Omitting a citation to *People v. Mom* (2000) 80 Cal.App.4th 1217 (*Mom*), and excluding the last two sentences, defendant quotes from the following paragraph of the *John Z.* dissent to support this proposition: "The majority relies heavily on John Z.'s failure to desist immediately. But, it does not tell us how soon would have been soon enough. Ten seconds? Thirty? A minute? Is persistence the same thing as force? (See [*Mom, supra,*] 80 Cal.App.4th [at p.] 1224 [] [*suggesting force must be 'substantially different from or substantially greater' than that necessary to accomplish the act itself*].) And even if we conclude persistence should be criminalized in this situation, should the penalty be the same as for forcible rape? *Such questions seem inextricably tied to the question of whether a reasonable person would know that the statement 'I need to go home' [which the victim in John Z. had said during intercourse] should be interpreted as a demand to stop. Under these circumstances, can the withdrawal of consent serve as a proxy for both compulsion and wrongful intent?*" (*John Z.*, *supra,* 29 Cal.4th at pp. 767-768, dis. opn. of Brown J, italics added to show language omitted in the defendant's opening brief.) Next, defendant argues that the majority in *John Z.* did not dismiss Justice Brown's concerns, but instead said they were not relevant in the case before it.

The defendant's omissions from the quote taken from *John Z.* are telling.

First, approximately a year later, in *Griffin*, our Supreme Court would disavow a rule that requires the force necessary to find forcible rape needs to be, " '*substantially* different from or *substantially* greater than' the physical force normally inherent in an act of consensual sexual intercourse." (*Griffin*, *supra*, 33 Cal.4th at p. 1023.) In fact, the *Griffin* court specifically stated that, to the extent the majority opinion in *John Z.*

16

mentioned the "substantially different from or substantially greater," standard as articulated in *Mom*, "[w]e did not have the issue of whether the *Cicero/Mom* specialized definition of force is applicable in forcible rape cases directly before us in *In re John Z*. Accordingly, our citation to *People v. Mom*, and our mention of the 'substantially greater/substantially different' definition of force followed in *People v. Mom* was dicta, and is not controlling on the point of law we decide today." (*Griffin*, at p. 1028, fn. 4.) Thus, when one follows the treatment of the authority the *John Z.* dissent relied upon, one sees our high court has not looked at that authority with favor.

Second, even the language taken from the *John Z.* dissent suggests that Justice Brown's reservations about whether continued intercourse supports a finding of forcible rape—with the attendant wrongful intent—after withdrawal of consent were based, in part, on whether the victim's statement could be interpreted as a "demand to stop." (*John Z.*, at pp. 767-768, dis. Opn. of Brown J.)  Here, *defendant testified* Doe said, "stop" and he did not immediately stop.  Instead, he decided she was not serious, and continued for another 20 to 30 seconds.

Contrary to defendant's argument, under the law, defendant's continuance of the act of sexual intercourse after Doe said stop supports a finding that he used a level of force that was enough to overcome Doe's will.

Defendant suggests that, under his version of events, the evidence does not support a finding that he "intended" to use force to overcome Doe's will.  We disagree.  Our colleagues in the Fourth District Court of Appeal have articulated the mens rea requirement for forcible rape as follows:  "Because nearly every crime requires a mens rea, however, our courts have held that a defendant must have intended to have sex against the victim's will.  [Citation.]  If a defendant held an honest and reasonable belief that the victim consented to sex, he cannot be found guilty of rape." (*People v. Dearborne* (2019) 34 Cal.App.5th 250, 260-261 (*Dearborne*).)  Defendant admitted he heard Doe say "stop" and kept going, and he later apologized to Doe.  Under these facts a

jury could conclude defendant intentionally continued to have sex—the jury could have concluded he did not really care if her mind said "no" because her "body" said "yes"—knowing his actions would overcome any will Doe had to "stop." Also, defendant's claimed belief that Doe consented to continued intercourse under the facts as he described them was not reasonable. She said, "stop."

III

*CALCRIM No. 1000*

Defendant argues that the language the trial court added to the pattern jury instruction outlining the elements of rape misapplied case law, is argumentative, and lowered the People's burden of proof. Because we disagree, we do not consider the parties' arguments regarding prejudice or forfeiture.

California Criminal Jury Instruction (CALCRIM) No. 1000 provides the pattern jury instruction for forcible rape. In addition to identifying the three elements the People must prove beyond a reasonable doubt to support a guilty verdict, the instruction includes suggested clarifying and other language to use depending on the evidence in a given case. (See CALCRIM No. 1000.) The trial court used some of that language.

Specifically, the trial court included language that states: "[a] woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without her consent if: [¶] 1. She communicated through words or acts to the defendant that she no longer consented to the act of intercourse; [¶] 2. A reasonable person would have understood that her words or acts expressed her lack of consent; [¶] AND [¶] 3. The defendant forcibly continued the act of intercourse despite her objection."

The trial court also included language that says, "[i]ntercourse *is* [established or] *accomplished by force* if a person uses enough physical force to overcome the woman's will."

18

The trial court also instructed the jury using CALCRIM No. 1000's suggested instruction regarding a *Mayberry* defense. It says, "[t]he defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse and actually and reasonably believed that she consented throughout the act of intercourse. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty."

At the request of the People, the trial court added the following to the jury instruction on rape: "[t]he force required by law is not substantially different from or substantially greater than the physical force normally inherent in the act of consensual sex. The prosecution must show that the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the complaining witness." Defense counsel had objected to including the proposed language on the grounds that, "[t]he jury instruction already contains a definition of force. It says intercourse is accomplished by force if a person uses enough physical force to overcome the woman's will. So it appears that that language is pretty much the same as what the government is requesting. So I would object to altering the instruction because it appears to address that issue already." Defense counsel also characterized the request for an additional instruction regarding force as "essentially an admission that there's evidence missing to support the force element."

The court also instructed the jury using CALCRIM No. 250. According to that instruction, "[t]he crime charged in this case requires proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime of rape [which is] Penal Code 261(a)(2) . . . that person must not only commit the prohibited act . . . but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act . . . ; however, it is not required that he or she

19

intend to break the law.  [The law --] the act required is explained in the instruction for that crime."

In their closing argument, the People argued "the only question" on the rape charge was "was there consent[?]"  When arguing the jury should find force was used, the People argued, "[f]orce, it of course is done by force if a person uses enough physical force to overcome the woman's will.  And that is further defined.  What does it mean to overcome her will?  It states the force required by law is not substantially different from or substantially greater than the physical force that is normally inherent in the act of sexual intercourse.  The prosecution must show that the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the complaining witness.  [¶]  So what does that mean?  It's defining what does it mean to overcome her will.  It means to use the kind of force that would normally be involved in the act of consensual sexual intercourse against the will of the complaining witness.  That is just a long way of saying they did not consent.  If it's the very act that you would normally see in consensual sexual intercourse and it is being done against the will of the victim, that that is what is meant under the law by using force to overcome their will which I submit to you is present in this case.  The evidence has shown time and again that this was against her will.  She did not want this to happen."

In closing arguments, the defense also treated the central issue in the case as having to do with consent rather than force.  Defense argued the "crux of the argument here," was "that Mr. Rivers reasonably believed in [Doe's] consent."

"Trial courts only have a sua sponte duty to instruct on 'the general principles of law relevant to and governing the case.'  [Citation.]  'That obligation includes instructions on all of the elements of a charged offense' [citation], and on recognized 'defenses . . . and on the relationship of these defenses to the elements of the charged offense.'  [Citations.]"  (*People v. Rubalcava* (2000) 23 Cal.4th 322, 333-334; see also *People v. Lyon* (2021) 61 Cal.App.5th 237, 252 (*Lyon*).)

"Pinpoint" instructions include instructions that " ' "relate particular facts to a legal issue in the case . . . ." ' ' [Citations.]  Parties are entitled to legally correct and factually warranted pinpoint instructions, should they request such additional instruction. [Citation.]  However, a trial court may properly refuse to give a pinpoint instruction that 'incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.'  (*People v. Moon* (2005) 37 Cal.4th 1, 30 [].)"  (*Lyon*, *supra*, 61 Cal.App.5th at p. 252.)

"We review a claim of instructional error de novo."  (*People v. Thomas* (2023) 14 Cal.5th 327, 382; see also *People v. Posey* (2004) 32 Cal.4th 193, 218)  " ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given."  [Citation.]'  (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338 [].)"  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088; see also *People v. Carrington* (2009) 47 Cal.4th 145, 192 (*Carrington*); accord *Lyon, supra,* 61 Cal.App.5th at p. 253.)

"There is no special amount of force required to prove forcible rape. . . .  'The question for the jury . . . [is] simply whether defendant used force to accomplish intercourse with [Doe] against her will, not whether the force he used overcame [her] physical strength or ability to resist him.'  ([*Griffin*, *supra*, 33 Cal.4th] at p. 1028.)"  (*People v. Torres* (2024) 107 Cal.App.5th 513, 531.)

In *Griffin*, *supra*, 33 Cal.4th at page 1022, "our high court specifically rejected a definition of force that was ' "*substantially* different from or *substantially* greater than" the physical force normally inherent in an act of consensual sexual intercourse.' "  (*Dearborne, supra,* 34 Cal.App.5th at p. 258.)  Thus, the trial court's instruction to the jury that, "[t]he force *required by law* is not substantially different from or substantially greater than the physical force normally inherent in the act of consensual sexual intercourse," was a correct statement of law.  Moreover, the court ensured that the

21

requisite finding regarding the ability of force to overcome Doe's will was not lost with the additional language by also stating, "[t]he prosecution must show that the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the complaining witness." This is in addition to the inclusion of form language that, "[i]ntercourse is [established or] accomplished by force *if a person uses enough physical force to overcome the woman's will*." Taken together, these instructions correctly conveyed to the jury that the law does allow for a finding of rape when the force used was not substantially greater or substantially different than the force used during consensual sex, *but* that force still needed to be enough to overcome Doe's will. (See *Carrington*, *supra*, 47 Cal.4th at p. 192.)

Defendant asserts that the instruction was argumentative.

" 'Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition.' " (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359-360.)

"An argumentative instruction 'invite[s] the jury to draw inferences favorable to [a party] from specified items of evidence on a disputed question of fact, and therefore properly belongs . . . in the arguments of counsel to the jury.' " (*People v. Flores* (2007) 157 Cal.App.4th 216, 220.)

Here, the instruction did not invite favorable inferences based on specified items of evidence. It simply added a point of clarification regarding force that is frequently emphasized in California decisions. (See *People v. McCann* (2019) 41 Cal.App.5th 149, 157; *Dearborne, supra,* 34 Cal.App.5th at p. 258; People v. Rowe (2014) 225 Cal.App.4th 310, 321 [" 'Force' for purposes of forcible rape or sodomy is the degree

22

of physical force sufficient to support a finding the sexual activity was against the victim's will. [Citations.] It need not be substantially different or substantially greater than the force inherent in consensual sexual activity"]; *In re Jose P.* (2005) 131 Cal.App.4th 110, 115.)

Defendant appears to be making two arguments to support his theory that this instruction was argumentative.

First, he argues that while *Griffin* supports that the force inherent in normal intercourse may support a forcible rape conviction, it did not exclude the possibility that such conduct may be insufficient in some cases, and the pinpoint functionally told the jurors "the physical force normally inherent in the act of consensual sex *is all the law requires*."

The record belies this argument. The instruction does not say the amount of force inherent in consensual sex is "all" that is required. The instruction states the law does not require the force to be "substantially different" or "substantially greater" than the force normally expected in sex. Indeed, the sentence defendant has focused on is followed by the statement that, "[t]he prosecution must show that the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the complaining witness." Taken together, and particularly given the remainder of CALCRIM No. 1000 the court used, this instruction did not tell the jury the force used in normal sex is all the law requires for a finding of rape and that no examination of the impact of that force on Doe's will was necessary: the jury would have understood whatever force was used had to be enough to overcome Doe's will.

Second, defendant argues the instruction failed to maintain the nexus between the use of force and defendant's intent to override Doe's will.

"The necessary 'wrongful intent' " in forcible rape, "is not the intention to violate the law *but the intent to commit the forbidden act*. [Citation.] Where the charge is rape, the forbidden act consists of two elements: (1) sexual penetration, and (2) overcoming the

will of the victim by force or fear.  Thus, the 'wrongful intent' is the intent to sexually penetrate the victim and the intent to accomplish that act by force or fear."  (*People v. Burnham, supra,* 176 Cal.App.3d at p. 1140, italics added.)

Defendant argues that the "force" element of rape is "tied to the *defendant's* state of mind; [because] it evidences the defendant's intent to overcome [a victim's] will."  He reasons that in the post-penetration withdrawal of consent cases, the "degree of force is particularly important because consensual sex is already in progress."  Further, he reasons, "an instruction that the physical force inherent in consensual sex satisfies the force element directs the finding of force in post-penetration withdrawal of consent cases."

As explained above, the instruction *did not* direct the jury that the force in consensual sex alone satisfies the force element.  The instruction (1) stated that the force did not need to be substantially different or greater than the force in normal sex; (2) stated that the force needed to be sufficient to support a finding that the act was against the complaining witnesses will; *and* (3) was part of an instruction that said "[i]ntercourse *is* [established or] *accomplished by force* if a person uses enough physical force to overcome the woman's will."  Moreover, the jury was instructed that it needed to find that defendant "intentionally" committed the "prohibited" act described in CALCRIM No. 1000.  That is, the jury was told that to find defendant guilty of rape, it needed to find he *intentionally* accomplished sexual intercourse—be that initially or as a continuing act—without Doe's consent using a level of force that was sufficient to overcome her will.

Defendant argues the instruction given lowered the prosecution's burden of proof.  The instruction did not lower the People's burden of proof.  It was a correct statement that included language regarding the requirement that the People prove the defendant used the requisite level of force in committing the rape.

24

Defendant's cites *People v. Myles* (2023) 89 Cal.App.5th 711 (*Myles*), and *People v. Hunter* (2011) 202 Cal.App.4th 261 to support his argument.

In *Myles*, the defendant had been found guilty of burglary and intended burglary, which required the defendant intended to commit theft. (*Myles, supra,* 89 Cal.App.5th at pp. 715-716, 729.) Theft, in turn, requires an intent to permanently deprive the owner of possession of his property. (*Id.* at p. 730.) The defendant had presented evidence at trial that he suffered a mental impairment that made him believe he owned the home he burglarized. (*Id.* at p. 715.) The *Myles* trial court modified the pattern instruction on the definition of theft by larceny (CALCRIM No. 1800) by adding the sentence: " 'The unauthorized use of utilities in a residence or consumption of property within the home is considered larceny for purposes of Burglary.' The modified instruction also contained citations to appellate decisions involving burglary charges arising from alleged incidental use of utilities and consumption of food inside a victim's home, with these parenthetical factual summaries: 'holding that making a long-distance call constituted intent to commit larceny' and 'theft of utilities could not be proven without evidence that entrant intended to use utilities and did in fact use utilities.' " (*Id.* at pp. 715-716.) The court of appeal found reversible error because, "the additional sentence the trial court added to the pattern instruction . . . gave the jury an alternate, incomplete definition of theft that omitted the required specific intent." (*Id.* at p. 731, fn. omitted.) It found the case summaries provided with the written instructions reinforced the error. (*Id.* at p. 734.) Here, the added language did not provide an alternate route to conviction that eliminated an element of the crime.

In *Hunter*, the defendant admitted to charged robberies and a burglary, and the sole issue at trial was a challenge to a Penal Code section 12022.53, subdivision (a), allegation that the defendant had used a firearm in three of the four offenses. (*Hunter*, *supra*, 202 Cal.App.4th at pp. 264, 267.) As part of the jury instructions, at the request of the prosecutor, the trial court said: "[w]hen a defendant commits a robbery by displaying an

object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm. The victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm." (*Id.* at p. 267.) Trial witnesses had testified that defendant flashed what appeared to be a real gun during the robberies. (*Id.* at p. 265.) The Court of Appeal concluded, "that the instruction is not reversible per se because it did not direct the verdict, but that it did impermissibly lighten the prosecution's burden to prove the use allegation beyond a reasonable doubt and therefore should not have been given." (*Id.* at p. 264.)

In finding error, the Court of Appeal explained the initial sentence was unduly argumentative. (*Hunter*, *supra*, 202 Cal.App.4th at p. 275.) The court noted, "the jury could just as accurately have been told the opposite, that when a defendant displays an object that looks like a gun, the object's appearance and the defendant's conduct may constitute sufficient circumstantial evidence to support a finding *that it was not a firearm*." (*Id.* at p. 276.) The second sentence in the instruction caused the court even greater concern. (*Ibid.*) The court wrote, "the challenged instruction did not direct the jury that it could not find a reasonable doubt whether the gun was real based on the victims' inability to 'say conclusively that the gun was real and not a toy.' But the instruction did highlight this one aspect of the evidence as not necessarily creating a reasonable doubt, thereby permitting the jurors to interpret the instruction as a caution against finding a reasonable doubt on this basis. This impermissibly alleviated the district attorney's need to persuade the trier of fact that the gun used in the robbery was a real one, the most important fact at issue in the case." (*Ibid.*)

In contrast, here the instruction stressed the burden of proof fully resided with the People. (See *People v. Mullins* (2018) 19 Cal.App.5th 594, 609-610 ["Defendants' reliance on *Hunter* is misplaced. Unlike the instruction in *Hunter*, the instruction in this

case did not make the prosecution's argument. In *Hunter*, the instruction informed the jury that a victim's inability to identify the object as a gun did not create a reasonable doubt"].)

Defendant's reliance on the reasoning in the dissent in *John Z.*, *supra*, 29 Cal.4th 756, is as unpersuasive on this issue as it was in his arguments regarding the substantial evidence issue.

## IV

### *Lack of Jury Instruction on Battery*

Defendant argues the trial court committed error because it did not instruct the jury on the lesser included offense of simple battery sua sponte.

" '[A] trial court must give " ' "instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." ' " [Citation.] "As our prior decisions explain, the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." [Citation.]' (*People v. Romero* (2008) 44 Cal.4th 386, 402–403 [].)" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 477.)

"Speculation is insufficient to require the giving of an instruction on a lesser included offense. [Citations.] In addition, a lesser included instruction need not be given when there is no evidence that the offense is less than that charged." (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.) "[I]t has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included

27

offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense." (*People v. Kelly* (1990) 51 Cal.3d 931, 959; accord *People v. Weddington* (2016) 246 Cal.App.4th 468, 489.)

We review claims concerning a trial court's not instructing on a lesser included offense de novo, considering the evidence in the light most favorable to the defendant. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

"In a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson*. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 178.)

"Battery, which is defined as 'any willful and unlawful use of force or violence upon the person of another,' (Pen. Code, § 242) is a lesser included offense of rape by means of force or fear. (*People v. Lema* (1987) 188 Cal.App.3d 1541, 1545 [].)" (*People v. Guiterrez* (1991) 232 Cal.App.3d 1624, 1636, fn. omitted.)

Defendant argues that the jury could have found continuing intercourse for 20 to 30 seconds after Doe said, "stop," was an offensive touch, but not sufficient force to overcome Doe's will, and that defendant was guilty of battery, not rape.

"[B]attery is a general intent crime." (*People v. Lara* (1996) 44 Cal.App.4th 102, 107.) As a general intent crime, "the crime of battery requires that the defendant actually intend to commit a 'willful and unlawful use of force or violence upon the person of another.' [Citations.] In this context, the term 'willful' means 'simply a purpose or willingness to commit the act . . . .' " (*Ibid*.) With simple battery, "[a]ny harmful or offensive touching constitutes an unlawful use of force or violence." (*People v. Martinez*

28

(1970) 3 Cal.App.3d 886, 889.)  Thus, the requisite intent required for a finding of battery is an intent to commit a harmful or offensive touching.

The pattern instruction for simple battery states, "[t]o prove that the defendant is guilty of this crime, the People must prove that:  [¶]  The defendant willfully [and unlawfully] touched [the victim] in a harmful or offensive manner."  (CALCRIM No. 960.)

Under these facts, if there was a battery, the offensive touch was the act of sexual intercourse against Doe's will.  And that action—continuing after she said "stop"—was the use of sufficient force which could and did overcome her will to "stop."  The harm was the, "outrage to the person and feelings of" Doe.  (See Pen. Code, § 263.)  That is, if defendant had the requisite intent to commit the lesser included offense of battery under these facts, he committed rape.  If he had an actual and reasonable belief that Doe consented to the act of continuing sexual intercourse, he would have had a defense to the charge of rape and the jury would not have found him guilty of simple battery.  The trial court was not obligated to give a simple battery instruction under these facts.

Simply put, the real issue in this case was whether Doe consented to continued sexual intercourse.  If she consented, the act was neither a battery nor forcible rape.  If she did not, it was no less than forcible rape.

V

*Error on the Abstract of Judgment*

According to the reporter's transcript, at the sentencing hearing, the trial court said it would "impose only the mandatory minimum fines and fees" as part of defendant's sentence.  According to the abstract of judgment prepared in this case, defendant is to pay $900 in restitution fines under Penal Code section 1202.4, subdivision (b), and $900 under Penal Code section 1202.45, if parole is later revoked.  Defendant argues the fines

29

should be $300 and we should order the abstract of judgment corrected. The People agree and so do we.

Under Penal Code section 1202.4, subdivision (b)(1), when a person is convicted of a felony, the trial court, "shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. [¶] (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)."

Under Penal Code section 1202.45, subdivision (b), "where a person is convicted of a crime and is subject to either postrelease community supervision under Section 3451 or mandatory supervision under subparagraph (B) of paragraph (5) of subdivision (h) of Section 1170, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional postrelease community supervision revocation restitution fine or mandatory supervision revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." Therefore, the mandatory minimum fine under both statutes is $300, not $900.

The oral pronouncement of judgment controls where there is a discrepancy between it and the abstract of judgment. (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 893.)

Courts of appeal may order corrections to an abstract of judgment when there is an evident discrepancy between the judgment in the reporter's transcript and the abstract of judgment. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 188.) Here, the abstract of judgment must be corrected in item number 9.a. to reflect that the restitution fines imposed under Penal Code sections 1202.4, subdivision (b), and 1202.45, are each the statutory minimum of $300.

DISPOSITION

The matter is remanded to the trial court to correct the abstract of judgment. The judgment is otherwise affirmed.

_____,
HULL, Acting P. J.

We concur:

_____
ROBIE, J.

_____
KRAUSE, J.